747 S.W.2d 81 (1988)
295 Ark. 107
INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, et al., Appellants,
v.
Jerry HUDSON, et al., Appellees.
No. 87-222.
Supreme Court of Arkansas.
March 21, 1988.
*82 Scotty Shively, Little Rock, for appellants.
Robert J. Donovan, Marianna, for appellees.
NEWBERN, Justice.
This appeal is from an order certifying a class action. The appellees, who are non-union salaried and hourly employees of Sanyo Manufacturing Corp. in Forrest City, sued the appellants, the International Union of Electrical, Radio and Machine Workers, and their Local 1106. The allegations were that the defendant unions were responsible for striking picketers who prevented plaintiff class members from entering the Sanyo plant to work and that the unions were thus liable for personal injuries and property damage sustained by plaintiff class members. The complaint asserted it was brought on behalf of the named plaintiffs and other employees similarly situated.
After a hearing, the trial judge certified the action as a class action pursuant to Ark.R.Civ.P. 23, and his order described two classes:
(a) All salaried and non-union hourly employees who allegedly were deprived of the right to work at Sanyo Manufacturing Corporation on October 7, 8 and 9, 1985 due to the plant closing.
(b) All salaried and non-union hourly employees receiving motor vehicle and/or personal damages when crossing or attempting to cross the striker picket line during the Sanyo strike on October 7, 8 and 9, 1985.
The unions make four arguments: (1) the trial court abused its discretion in certifying the class action, (2) the number of persons seeking relief was too small to meet the requirement of Rule 23, (3) there were not predominant common questions of law or fact as required by the rule, and (4) a tort action should not be allowed to proceed as a class action. We hold there was a sufficient showing of compliance with the requirements of Rule 23 and that the trial court did not abuse his discretion in certifying a class action. We find no reason to hold that a tort action may not proceed as a class action. Thus, the order of the trial court is affirmed.
On October 7, 8, and 9, 1985, members of the unions went on strike at the Sanyo plant in Forrest City. Seven Sanyo employees brought this action against the unions, and some named union members, claiming loss of pay on days when the plant was closed because of the strike. Some of the plaintiffs also claimed damages for personal injuries and property damage sustained when some of the plaintiffs crossed, or attempted to cross, the picket line.
A hearing was held in response to the plaintiffs' request that the action be certified as a class action. Jerry Hudson, the supervisor of hourly personnel at Sanyo, testified about the strike and the accompanying violence which he was attempting to film with a video camera at the plant beginning October 7. He testified that there were some 2000 persons employed at the plant. With the exception of some 200-250 non-union hourly employees, all of those who got in were salaried employees. Mr. Hudson presented affidavits of thirty-four employees who had suffered property damage *83 while attempting to drive their vehicles into employee parking lots. He also presented petitions signed by thirty-five employees who certified that they had been "affected by the conduct of the defendants in such manner as to qualify them as a member of the class described in the complaint."
Jack Shands, industrial relations manager at the Sanyo plant, testified that at the beginning of the strike, the company plan was to conduct minimal production so that any salaried or hourly employee would have work to do if he or she showed up. On October 7, approximately 450 employees made it through the picket line. However, apparently before the night shift on that date, the plant was closed because of the risk to employees attempting to make it through "the crowd." It was the intent of the management to get an injunction to move the strikers away from the parking lots where the violence was occurring.
Whether salaried or hourly, only the employees who came to work on October 7th were paid with the exception of some salaried employees who may have been owed paid leave. Mr. Shands presented a list showing that twenty-one hourly employees were paid during the time the plant was closed. It appears that nearly all of the salaried employees were paid during this period.
Bill Runyan, an insurance adjuster, testified that his company was employed by Sanyo to make damage appraisals on October 7. He and two fellow adjusters made seventy-three damage estimates which included damages to forty-two automobiles totaling $23,601.20. He said he was told that the damages had occurred on October 7.

1. Abuse of discretion
Independently of the issues of numerosity, common question, and whether a tort may be subject of a class action, the unions assert the trial court abused its discretion in certifying a class action. They contend that the trial court should have recognized the traditional reluctance of this court to permit the certification of classes and refused to certify this one. The unions have good reason for their position, as we have not been clear in the interpretation of Rule 23.
Drew v. First Fed. Savings & Loan Ass'n, 271 Ark. 667, 610 S.W.2d 876 (1981), was the first of six significant cases in which we have considered whether it was proper to certify a class action pursuant to Rule 23, which was adopted in 1979. The party seeking class certification claimed that First Federal was committing usury and extortion by requiring a 1% mortgage assumption fee. There was a showing that First Federal had treated all persons who had assumed mortgages held by it alike, but there was no showing that there might not be different defenses with respect to each mortgage assumption contract. We noted that in some cases First Federal might be able to prove that the effort involved in permitting the assumption would wholly justify the fee, and it should be allowed to raise that defense individually. In our general discussion of Rule 23 and class actions, we recognized that, prior to the adoption of the rule, we had not favored class actions. We cited Ross v. Ark. Communities, 258 Ark. 925, 529 S.W.2d 876 (1975), in which we had held that, under our superseded class action statute, a party seeking class certification had to show that there were common questions of law and fact to be decided. We noted that the new rule had liberalized that aspect of the matter by requiring only a common question of law or fact. We also pointed out that under our rule the party seeking certification must be able to show that the class action "is superior to individual remedies for the fair and efficient adjudication of the controversy. Not merely efficient but also fair...." 271 Ark. at 670, 610 S.W.2d at 878. We recognized that the chancellor had "broad discretion" in the matter and held that she had not abused that discretion in refusing certification, noting that for the class action to be superior to individual actions, it must be shown to be fair not only to the mortgage assignees seeking the certification but to First Federal, the party against whom the class would proceed.
*84 Our second decision under the rule was City of North Little Rock v. Vogelgesang, 273 Ark. 390, 619 S.W.2d 652 (1981), in which we upheld, upon cross appeal, the trial court's decision that it had not been shown that the number of potential class members was sufficiently large to make other means impracticable. The potential class consisted of only seventeen identifiable members.
In Ford Motor Credit Co. v. Rogers, 285 Ark. 64, 685 S.W.2d 145 (1985), we denied a writ of prohibition which would have prevented a chancellor from trying a case she had certified as a class action. Ross Nesheim contended Ford Motor Credit had charged usurious interest on his car purchase contract, and on every other auto finance agreement it had written since the adoption of Amendment 60 to the Arkansas Constitution, and that the named plaintiffs should be allowed to sue for themselves and others similarly situated who had been charged usurious interest. Ford Motor Credit argued that the case could not constitutionally be tried as a class action because our rule does not provide for mandatory notice to potential class members. We held that Ford Motor Credit had no standing to raise the issue on behalf of the potential class members. While that holding has no significance in this case, the lack of a notice provision in our rule may portend future problems, and it should not be ignored in any general review of our interpretation of the rule.
The order certifying Nesheim's claim as a class action was thereafter appealed, and in Ford Motor Credit Co. v. Nesheim, 287 Ark. 78, 696 S.W.2d 732 (1985), we considered its merits. We first noted that although the chancellor had broad discretion in the matter, it was not unlimited discretion. We then compared Nesheim's claim to that of Drew against First Federal. We found similarities in that Ford Motor Credit would have varied defenses against the class members and setoffs and at least one counterclaim against one of the members. We disapproved of the chancellor's attempt to limit the class to persons who were not delinquent in their payments to Ford Motor Credit on the ground that disputes over delinquency were sure to arise. We noted that the litigation was, like that in the Drew case, sure to splinter into a number of cases posing serious manageability problems. We said we were unable to ascertain a "willing class of litigants" of whose claim Nesheim's was typical and that a class member who might not want to sue the company should not be "made an unwilling litigant." Finally, we could find no prejudice to anyone in refusing to certify the class and noted our unwillingness to resolve doubts in favor of class actions and that our rule and the statute it supplanted had been construed strictly in the Drew and Ross cases, respectively.
In Cooper Communities, Inc. v. Sarver, 288 Ark. 6, 701 S.W.2d 364 (1986), realtors and property owners in Hot Springs Village claimed that the lease of a gatehouse to Cooper Communities, Inc. (Cooper) was invalid and that Cooper was engaged in an unfair trade practice because it used the gatehouse to sell lots in the village, thus gaining an unfair advantage over other would-be sellers. Sarver, the named plaintiff, presented 120 affidavits of owners saying they wanted the relief sought which was cancellation of the gatehouse lease. The chancellor certified the class, and Cooper appealed. We upheld the certification, citing the Drew case for the proposition that the chancellor has, again, "broad discretion" to decide whether a class action is proper. We said that the validity of the lease was the paramount issue in the case, and the certification was proper.
The most recent case is Arkansas Louisiana Gas Co. v. Morris, 294 Ark. 496, 744 S.W.2d 709 (1988). The chancellor certified as a class of plaintiffs persons who had granted "fixed price" mineral leases to Arkansas Louisiana Gas Co. (ArkLa). The complaint relied upon a number of theories of relief, including the remedy of reformation based on mutual mistake, and estoppel. ArkLa argued that in order for any of the leases to be affected, the individual lessor would be required to show reliance or mistake. The plaintiffs argued they should be certified as a class as they had all been *85 treated the same by ArkLa in that their fixed price leases had been ignored and they had been paid varying rates of royalties. The common question was the validity and effect of the fixed price leases. We said:
The appellants [ArkLa] rely primarily on the case of Ford Motor Credit Company v. Nesheim,.... In Nesheim the chancellor granted a conditional class action. We reversed that decision primarily because the defenses of mutual mistake, waiver, estoppel, and set off pled by the defendant as well as the defendant's possible counter claims would splinter the action into possibly 6,000 individual cases. The foreseeable problems of manageability and the lack of prejudice to anyone by denying certification led us to conclude that the class action would not be superior to individual remedies.
Even if appellants are correct in this respect it does not require decertification of the class action because the appellees allege several other grounds for relief and other valid grounds for relief may be developed during the trial. Additionally, at this point in this case there are no indications of management problems or prejudice to any party in allowing the case to proceed as a class action. We are able to determine from the record a common question of fact that all "fixed price" lessors in the Cecil Field have been treated identically by the defendant lessees for a number of years. The parties have for some reason ignored the royalty amount fixed in the original leases and have paid and accepted royalties of different amounts. Is is apparent that the common question of law in this case is whether the defendants' course of conduct gives rise to a cause of action in favor of the "fixed price" lessors in the Cecil Field. There is no requirement that the trial court find that the facts as to each individual of a class action must in every respect be identical with that of all other members of the class. It is enough to show that a common question of law or fact predominates over other questions affecting only individual members.
If the trial court finds that the evidence presents individual questions of reliance or mistake, it could either defer those individual questions until after it disposed of the questions common to the class, or at any time prior to judgment, order an amendment of the pleadings eliminating therefrom all reference to representation of absent persons, and order entry of judgment in such form as to affect only the parties to the action and those who were adequately represented.
Although our class action rule is patterned somewhat after the federal rule, there is a considerable difference in application. The federal rule leans toward allowing class actions whereas our position tends to discourage class actions if the matter can be handled by individual action. But in Cooper Communities, Inc. v. Sarver, 288 Ark. 6, 701 S.W.2d 364 (1986) and Drew v. First Federal Savings & Loan Association of Fort Smith, 271 Ark. 667, 610 S.W.2d 876 (1981), we held that in determining the appropriateness of a class action the trial judge has broad discretion. From the record before us we are unable to say that the chancellor abused his discretion in declaring this to be a proper class action. [294 Ark. at 498-500, 744 S.W.2d at 710-711.]
The two cases that stand out in this review are the Nesheim and Morris cases. The Nesheim case is the only one in which we have disapproved the trial judge's action with respect to certification. In the Morris case there was just as much reason to disapprove the certification as in the Nesheim case, but we refused to do so. In the Nesheim case we relied on our tradition of refusing certification and upon fear of the management problems which might occur if the action were to splinter. In the Morris case we relied on our statements about the broad discretion of the judge, noting that perhaps management problems could be handled by the trial judge when they arose, even if that required decertification at some point.

a. Tradition
There is no need to go into the development of the class action from the old equity *86 bill of peace remedy. A fine treatment can be found in 7A, C. Wright, A. Miller, and M. Kane, Federal Practice and Procedure, §§ 1751-1753 (1986). Fed.R.Civ.P. 23 is the culmination of that development. In the Drew case, we noted that our Rule 23 did not copy the federal rule but that, in Rule 23(a), we copied our superseded, 100-year-old statute, and in subsection (b) we copied only a little of the federal rule.
While it is true that subsection (a) of our rule differs from that of the federal rule, the difference is one of language only. Both set out the same basic requirements for a class action. Subsection (b) of our rule, like that of the federal rule, sets out the prerequisites in addition to those found in subsection (a). Our subsection (b) is taken directly from subsections (b)(3) and (c)(1) of the federal rule. The parts of the federal rule omitted have to do with specifying further the kinds of actions which may be certified and some procedural requirements, such as the one for mandatory notice to class members mentioned above. Nothing about the parts of the federal rule omitted from our rule seems to bear on the question of whether class actions are to be favored or not. It seems apparent that the spirit of the federal rule is to be found in our Rule 23 even if all the words are not. Our attempts to cling to our pre-rule tradition may have been inconsistent with the rule. Reporter's Note 1. states the rule was based on a superseded statute which contained few procedural guidelines and that it does not change prior law. While the note is correct in stating that the rule, like the statute, has a paucity of procedural directions, we recognized in the Drew case that the law had been changed to "liberalize" the class action, at least in one respect. Use of it will obviously be more extensive if there need no longer be common questions of law and fact.

b. Broad discretion
Reporter's Note 2. to Rule 23 recognizes the "broad discretion" given to the court to protect the rights of absent class members and points out there is similar discretion in the federal rule. While the broad discretion noted is ostensibly different from broad discretion to allow or disallow a class action, the two are related. If the court has broad discretion to protect the rights of absent class members, that power should be regarded as contributing significantly to the discretion the court has to permit class actions, as the inability to protect class members would be a major impediment. In the Drew case, just after our discussion of the chancellor's decision that the class action was not shown to have been superior to other forms of relief and our reference to fairness discussed above, we said: "It is on this point that we cannot say the chancellor abused her `broad discretion' (Note 2 to our Rule 23) in finding that the class action is not superior to other remedies." Thus, beginning with the Drew case and through the Morris case, we have recognized that the "broad discretion" of the trial judge extends not only to the protection of the absent class members, but also to the question whether the class action should proceed.

c. Management
The language we have used about class actions "splintering" into separate cases requires examination in the context of Justice George Rose Smith's language in the Drew case. We should never depart from his assertion that, in deciding whether a class is to be certified, we must consider whether certification would be fair to all the parties. Clearly, it would have been unfair in the Drew case to have held that First Federal could present its defenses to the claims of some but not all of the members of the plaintiff class. Just as clearly it would have been unfair to prohibit Ark-La from presenting all its defenses with respect to the leases in the Morris case. Just as clearly it would be improper for us to hold that the unions in the case before us now could not present all their defenses to the individual claims of the non-union members who are the members of the putative class. But to assume that any of these injustices will occur is to assume that the action will not be managed by the trial court. *87 By limiting the issue to be tried in a representative fashion to the one that is common to all, the trial court can achieve real efficiency. The common question here is whether the unions can be held liable for the actions of their members during the strike. If that question is answered in the negative, then the case is over except for the claims against the named individual defendants which could not be certified as a class action. If the question is answered affirmatively, then the trial court will surely have "splintered" cases to try with respect to the damages asserted by each member of each of the subclasses, but efficiency will still be achieved, as none of the plaintiffs would have to prove the unions' basic liability.
Is that unfair? It is not unfair to the unions, as they will be able to defend fully on the basic liability claim, and they will have the opportunity to present individual defenses to the claims of individual class members if their liability has been established in the first phase of the trial. They lose nothing. Would it be fair to the class members to require them to sue individually? The evidence so far shows that each putative class member has a claim that is too small to permit pursuing it economically. If they cannot sue as a class, the chances are they will not sue at all. We agree with the unions' argument that the sole fact that the claims are small is not a reason to permit a class action, but it is a consideration which has appeared when other courts, as we must do, have considered whether the class action is superior to other forms of relief. See C. Wright, A. Miller, and M. Kane, supra, § 1779, n. 21, citing Roper v. Consurve, Inc., 578 F.2d 1106 (5th Cir.1978), affirmed on other grounds, sub nom. Deposit Guar. Nat. Bank v. Roper, 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980); Werfel v. Kramarsky, 61 F.R.D. 674 (D.C.N.Y.1974); and Buchholtz v. Swift & Co., 62 F.R.D. 581 (D.C.Minn.1973).
We recognize that the trial court has substantial power to manage a class action even though the directions given in our Rule 23 are not as extensive as those given in the comparable federal rule. This power to manage the action contributes to the discretion we find in the trial court to determine whether a class should be certified. We conclude there was no abuse in this case.

2. Numerosity
Rule 23(a) provides, "Where the question is one of a common or general interest of many persons, or where the parties are numerous, and it is impracticable to bring all before the court within a reasonable time, one or more may sue or defend for the benefit of all." The unions contend the court erred in finding this requirement to have been satisfied. As we have noted above, there is a common question, and that is whether the unions may be liable for the actions of the strikers. The issue is whether there is a question which is "one of common or general interest of many persons" or whether the parties are so numerous as to make it "impracticable to bring all before the court within a reasonable time."
We find no error. In the Vogelgesang case we held that seventeen was not a sufficient number. In the Cooper case we held that 184 was enough. Although, as the unions point out, only thirty-five persons have indicated an interest in being class members by affidavit, that does not define the class or limit it. With respect to the property damage and personal injury subclass, we find testimony that seventy-three damage estimates were made. With respect to the wage loss subclass, we note the testimony that the Sanyo plant closed for two days, and that the hourly employees, generally, were paid only for the time they worked. The potential class thus consists of all non-strikers who lost work time, and thus pay, during the strike. From the figures given at the outset of this opinion one can see that this subclass consists of at least several hundred employees, and we can agree that there is a question of common or general interest to "many persons."

3. Predominance
The unions argue that the single issue of their possible liability pursuant to *88 the "mass action" theory may not be held to predominate over the individual claims of the purported class members. "Mass action" liability has been found and discussed in cases such as International Union v. Russell, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958); Rainbow Tours v. Hawaii Joint Council, 704 F.2d 1443 (9th Cir.1983); and Alabama Power Co. v. Local Union No. 1333, 734 F.2d 1464 (11th Cir.1974). The theory espoused here is that a union may be responsible for the acts of its members on its behalf when violence erupts upon the attempt of non-strikers to enter a plant where the entrance is blocked by strikers.
On this point the unions cite the Drew case for the proposition that the court must find questions of both law and fact common to the class members. As noted above, that is opposite to the language of that case in which we recognized that only one or the other is required under Rule 23, and that was a change from the law as we espoused it in the Ross case. The only other case cited on this point by the unions is the Nesheim case. We agree with the unions' assertion that if we were to follow our decision in that case we would probably have to reverse here. We were mistaken in the Neshiem case. There was the same sort of predominant common question there as the one which exists here. To the extent the Nesheim case is inconsistent with our holding here, it is overruled.
The issue of the possible liability of the unions permeates the claims and prospective claims of each member of the two subclasses. It clearly predominates the individual issues which may arise if the unions are held liable under the mass action theory. If the unions prevail on that issue, then only individual claims against individual persons will remain, and the class will have to be decertified.

4. Tort claims
The unions do not seriously argue that tort claims may never be the object of class actions. Rather, their point is that this case is not typical of the "disaster" cases in which class action suits have been allowed where one event, such as a plane crash, structural failure, or fire has been responsible for injuries to a class of persons. They contend that, if a mass action can be said to be responsible for the injuries suffered, it occurred over a three-day period and involved numerous persons and events thus presenting no common question.
We disagree with that argument. Other jurisdictions have permitted class actions where the wrong alleged was, for example, nuisance which was conducted by industrial defendants over a period of time in excess of three days and in which more than one defendant was named by the plaintiff class of homeowners, each of whom had a separate damages claim. Oakwood Homeowners Assn. v. Ford Motor Co., 77 Mich. App.197, 258 N.W.2d 475 (1977). See also Burks v. Wymer, 307 S.E.2d 647 (W.Va. 1983).
The central question of the unions' liability will be the focus of the class action. That can be decided with respect to the subclasses even though the alleged mass action was not an instantaneous event. Again, if they are held liable in general, the unions will be able to present any defenses they may have as the claims of the individual class members are presented thereafter, the only effect of the decision being that the individual class members will not have to prove, and the court will not have to decide, the general question of union liability in each case.

CONCLUSION
We take no pleasure in having to overrule a case as recently decided as the Nesheim case. However, we believe the critical decision occurred with our adoption of Rule 23, and we are just now fully recognizing it. While Fed.R.Civ.P. 23(b)(3) has not been the panacea hoped for by consumer advocates and others concerned with small claims, see Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), we have no doubt that our Rule 23(b) patterned upon it permits the certification in this case. The trial judge in this case could have refused to certify the action as a class action, and we might well *89 have upheld him in that exercise of his broad discretion. Instead, he made the certification and tentatively scheduled the trial to begin in mid-June 1988 to continue until August 1, 1988. Obviously he intends to try each of the individual claims if the common question is decided in favor of the class. We are firmly convinced that justice will be well served by this approach, whichever way the common legal question is decided.
Affirmed.
GLAZE, J., not participating.